## Bressi v. Dobroth

*Walter W. Rabin*, for plaintiff.
*Harry Silver*, for defendant.

SPORKIN, *J.*, May 21, 1975—This matter is before the court on the motion of Thomas E. Bressi, Jr. and Rodgers Bressi (jointly referred to as "Bressi") to correct an award of arbitrators entered in favor of Richard E. Dobroth ("Dobroth").

The facts out of which this controversy arises may be summarized as follows:

On July 20, 1965, Bressi and Dobroth entered into a written contract (hereafter, "the agreement") whereby Dobroth was to perform architectural services in connection with the development by Bressi of an apartment complex on St. Croix in the United States Virgin Islands; the agreement contemplated two stages: Stage A, which encompassed construction of 18 apartment units, and Stage B, which provided for follow-up construction of 32 additional units at the option of Bressi.[1]

---

1. The pertinent part of the agreement which defines the full scope of the architectural services is as follows:

"1.(a) The Architect shall perform professional service . . . in connection with the development by Owner of one acre of the subject tract . . . with approximately eighteen (18) apartment units, and such onsite and offsite improvements and utilities as Owner shall deem necessary (hereinafter called Stage A).

"(b) In the event that Owner shall determine to develop the

Dobroth was to receive as compensation for architectural services rendered in connection with Stage A, five and one-half percent of the "cost of work"; in the event Stage B was also *constructed*, for the total services rendered by Dobroth in connection with the two stages, he was to receive three and one-half percent of the total "cost of work"; "cost of work" was defined, in paragraph 3 of the agreement, to mean "the actual cost to Owner (Bressi), as opposed to estimates secured by either party, of the work let under a general contract to complete the building or buildings to be constructed in the stage of the Project which is the subject of the calculation."[2]

Thereafter, Dobroth performed the architectural services contemplated by the agreement for Stage A and, at the express direction of Bressi, Dobroth proceeded with and completed the architectural drawings and specifications in connection with Stage B. Dobroth, in the course of performing these services received periodic fee payments from Bressi which ultimately totalled $47,500.[3] The contractor to whom the architectural plans for Stage A and B were submitted, however, presented a bid which was rejected by Bressi because it exceeded the amount he had budgeted for the project.

---

remaining two acres of the subject tract, in addition to the development referred to as Stage A, Architect shall perform professional services, as hereinafter defined, in connection with the construction of such additional building or buildings (hereinafter called Stage B)."

2. The percentage fee was to be revised upwards if Bressi acted as his own contractor.

3. These periodic payments, requested and received by Dobroth, were based upon Dobroth's estimates of costs of the contemplated construction which were submitted regularly by Bressi.

Subsequently, at Bressi's request, Dobroth made architectural *revisions* in an effort to reduce the building costs to a more acceptable figure. For reasons not pertinent here, though, *no construction based upon Dobroth's plans was ever commenced*, and when it became apparent that the project as designed by Dobroth was abandoned, Dobroth made demand upon Bressi for compensation *in addition* to the $47,500 he had already received, and also for recompense for the outlay of certain expenses.[4] When this demand was refused by Bressi, the dispute was submitted to arbitration, as provided for in the agreement. Bressi counterclaimed, contending that the $47,500 fees paid to Dobroth constituted overcompensation by Bressi to Dobroth, and sought reimbursement from Dobroth for such alleged overpayment. After hearing extensive testimony from both sides, the arbitrators entered an award in favor of Dobroth in the amount of $16,272.47 which was comprised of $12,408 for additional compensation and $3,863.20 for expenses. This motion by Bressi to correct the award followed and is now before us.

## DISCUSSION

At the outset, we must note the scope of our review. Under the Pennsylvania Arbitration Act of 1927 which governs the controversy,[5] the court is empowered to modify or correct the award "[w]here the award is against the law, and is such that had it

----

4. The record indicates that Bressi eventually built an apartment development on the site. However, this was based upon plans which were drawn up by an architect other than Dobroth (Frederick E. Allardt).

5. Paragraph 12 of the agreement expressly provides that arbitration shall be under the Act of 1927.

been a verdict of the jury the court would have entered a different or other judgment notwithstanding the verdict.": Act of April 25, 1927, P.L. 381 (No. 248), sec. 11, 5 P.S. §171(d). Applying this standard to the case at bar, it is clear that the arbitrators' determination, involving as it does the construction of a contract, constitutes a matter of law which falls squarely within the ambit of review prescribed by the Arbitration Act of 1927: Framlau Corp. v. Upper Dublin Sch. Authority Board, 219 Pa. Superior Ct. 369, 281 A. 2d 464 (1971); Baldwin v. Magen, 279 Pa. 302, 123 Atl. 815 (1924); Standiford v. Kloman, 234 Pa. 443, 83 Atl. 311 (1912). And it is equally clear, in our opinion, that the award of the arbitrators was based upon an erroneous interpretation of the agreement and must be modified.

The contentions of the parties which were clearly expostulated at the outset of the arbitration hearing, coincided, at least in part, factually. Both Dobroth and Bressi conceded that the agreement contained no express provision as to compensation to be paid for architectural services in the event of *abandonment* of the project, as in the instant case, where plans have been completed but prior to undertaking any construction thereof. The parties differed, however, on the *legal effect* of this contractual omission, Dobroth arguing that he should receive what was "fair and equitable" and Bressi contending that the proper measure of recovery was quantum meruit.

The issue for the arbitrators was thus drawn squarely: where the contract is silent as to remuneration, should compensation be in accord with a "fair and equitable" standard or on a quantum meruit basis. The arbitrators, however, for reasons

which are obscure, ignored the clear consensus of the parties and instead chose to make the finding, on which their award was based, that it was the intention of the parties that the compensation provisions of the agreement regarding termination "during" Stage A apply *even where the project is abandoned* prior to any undertaking of construction.[6]

---

6. The termination provisions of the contract appear in paragraph 9 which provides:

"This Agreement may be terminated by the Architect upon seven days written notice should the Owner fail substantially to perform in accordance with the terms of this Agreement through no fault of the Architect. This Agreement may be terminated by the Owner for any reason upon seven days written notice. Upon termination by the Owner, the Owner shall pay to Architect all sums then due pursuant to Paragraphs 6, 7 and 8 of this Agreement. If such termination by the Owner occurs during Stage A, the Owner shall pay to the Architect, in addition to such sums (1) the difference between such sums and the fair and reasonable value of the work performed by Architect to the date of termination, the determination of such value to be on the basis that of the five and one-half percent (5½%) fees on the contemplated cost of Stage A, fifteen percent (15%) shall be attributable to the work described in Paragraph 2(a)(i), twenty percent (20%) shall be attributable to the work described in Paragraph 2(a)(ii), and sixty-five percent (65%) shall be attributable to the work described in Paragraph 2(b); and (2) because of the extra service performed concurrently with respect to Stage B, the sum of Two Thousand Dollars ($2,000.00). If such termination by the Owner occurs after completion of Stage A but prior to commencement of Stage B, the Owner shall pay to the Architect, in addition to the sums then due pursuant to Paragraphs 6, 7 and 8 of this Agreement, the sum of Twenty Five Hundred Dollars ($2,500.00). Owner shall be deemed to have terminated this Agreement without notice eighteen (18) months after completion of Stage A, unless Owner shall commence the development of Stage B within such eighteen month period. If Owner shall pay the termination fee and commence the development of Stage B within twenty-four (24) months after such payment, he shall receive a

Although the agreement provided that if the project were terminated during, but prior to commencement of, Stage B, Dobroth would receive fees based, inter alia, upon five and one-half percent of the "contemplated cost" of completing *Stage A*, the agreement did *not* so provide with respect to abandonment where plans were submitted for both stages but construction was begun. Yet the arbitrators evidently strained the agreement provisions, beyond the four corners thereof, to compute Dobroth's fee as based, in part, upon a similar percentage of the contemplated cost of constructing Stages A and B according to Dobroth's plans. This constitutes, in our opinion, clear error. The issue of the intent of the parties having been *foreclosed* by the agreement of the parties themselves, the arbitrators, as a matter of law, should have applied a quantum meruit standard of recovery in the absence of any express contractual provision concerning payment for the services in question: Simsohn v. Wetter, 111 Pa. Superior Ct. 523, 170 Atl. 422 (1934); Jull's Estate, 313 Pa. 42, 169 Atl. 237 (1933).

Moreover, even had the question of the intent of the parties been properly in issue, we believe the interpretation of the agreement by the arbitrators was erroneous. It is the settled law of this Commonwealth that in ascertaining the intention of the parties to a contract, the surrounding circumstances, the situation of the parties, the objects

credit for such fee against the first fees payable to Architect thereafter."

(It is to be noted that *paragraphs 6, 7 and 8* of the agreement above referred to provided respectively for the schedule of advance payments to architect; monthly reimbursement of expense to architect; and the fee schedule of architect depending upon whether Stage A alone was to be completed or whether both Stages A and B were to be completed.)

that they apparently had in view and the nature of the subject matter of the agreement are relevant matters which may be taken into consideration: Edwin J. Schoettle Co. Appeal, 390 Pa. 365, 134 A. 2d 908 (1957); Foulke v. Miller, 381 Pa. 587, 112 A. 2d 124 (1955). And subsequent acts of the parties, tending to show the construction put upon the contract by the parties themselves, may be considered: People's Natural Gas Co. v. Braddock Wire Co., 155 Pa. 22, 25 Atl. 749 (1893). These criteria the arbitrators failed to follow.

Applying these elements to the case at bar, the inescapable conclusion is that the parties, at the time they entered into the agreement, simply never considered the possibility of abandonment of the project after completion of all architectural services pertaining to both Stage A and Stage B. On the contrary, the only provision found in the contract which refers to the compensation to be paid in the event of termination (set forth, supra, in note 6) clearly contemplates abandonment of the project after performance of the architectural services in relation to Stage A only with, at best, some fractional performance of the architectural services incidental to Stage B. This conclusion is compelled by the contractual proviso that in the event of termination, the maximum amount of compensation to be paid for the architectural services performed in connection with Stage B was $2,500. Since this represents but a small percentage of the amount of compensation required to be paid under the agreement for Stage B architectural services, it is clear that the termination provisions of the agreement were not intended to apply to abandonment of the project after *completion* of architectural services for Stage B.

The original target cost for the entire project when first discussed by Bressi and Dobroth was $1,000,000. Since Stage A was to consist of 18 units and Stage B 32 units, the projected cost of Stage A would have been approximately $360,000 (18/50 x $1,000,000) for which the architect's fee would have been roughly $19,800 (five and one-half percent of $360,000). Since the architect's fee for the entire project would have been approximately $35,000 (three and one-half percent of $1,000,000) the fee allocable to Stage B services would have been approximately $15,200 ($35,000, less $19,800). Thus, since no provision was made, in the event of termination after completion of the plans for Stage B, which even approaches a $15,000 figure for preparation of Stage B plans, we are impelled to conclude that termination, at the stages where it *actually* occurred, was not contemplated by the parties. It is indisputable, therefore, that the termination provisions of the agreement have no application to the situation here.

Nor do the cases presented cause us to alter this holding. The case of Orth & Bro. v. Board of Education, 272 Pa. 411, 116 Atl. 366 (1922), relied on by Bressi, in our view is clearly distinguishable from the matter at bar. In Orth, the contract in question contained the proviso that the Board of Education, which had contracted for the architect's services, reserved the absolute right to reject *all* construction bids, from which the court concluded that the termination payment schedule was necessarily made in contemplation of possible abandonment of the project. No such provision was included in the agreement here and Orth, therefore, is manifestly inapposite.

We thus remain of the opinion that the termina-

tion provisions of the agreement were never intended to apply to the situation which developed, viz., abandonment of the project after completion of *all* architectural services; compensation of Dobroth, therefore, should have been on a quantum meruit basis, Simsohn, supra.

Two questions remain: Applying a quantum meruit, is Dobroth entitled to additional compensation, or, alternatively, is Bressi under his counterclaim entitled to any repayment? The answers to both questions, in our opinion, must be in the negative. Dobroth, when offered the opportunity at the arbitration hearing, to present evidence of the compensation due under a quantum meruit measure of payment, refused to do so and thereby, in our opinion, failed to establish any right to additional compensation.

Nor is Bressi, in our view, entitled to any repayment. Quantum meruit is a construct of the law designed out of reasons of justice and equity on the one hand to confer compensation upon one who has performed work or services and, on the other hand, to prevent unjust enrichment of the beneficiary of that work or services. As such, it was never intended to be anything more than a means by which compensation may be received by a party (here, Dobroth) who has performed, partially or totally, his obligations under an agreement, but where the *other* party (here, Bressi) *terminates* the agreement prior to fulfillment of mutual consideration. Bressi's attempt at employment of the principle of quantum meruit represents a distortion of its purpose: he invokes it not to permit *recovery* of compensation, but to *limit* it, such a holding would in effect, engraft upon the concept of quantum meruit

still another construct which is completely unknown in the law. This we refuse to do.

Moreover, even if, somehow, Bressi's perception of quantum meruit were correct, in our opinion he would not be entitled to repayment based upon the record before us. A quantum meruit recovery is predicated upon the fair and reasonable value of the services provided: Simsohn v. Wetter, supra. Here, the only evidence offered by Bressi was the testimony of a registered architect, Frederick E. Allardt, Jr., who stated that after Bressi had abandoned the project based on Dobroth's plans, he, Allardt, had prepared completely new architectural plans and drawings for a 48-unit development at the same site for a fee of $25,000. He testified further that the services performed by himself and Dobroth were "essentially the same." The difficulty with this testimony is two-fold: First, there is nothing in the record to support the conclusion that Allardt's fee represented the fair and reasonable value of either his or Dobroth's services. Second, the phrase "essentially the same" is so broad-guage in meaning as to be useless. Since it was not developed whether, by use of the phrase, Allardt was referring to the quantity, quality or some other aspect of the work, we regard his testimony as irrelevant and inadequate to lend any support to Bressi's counterclaim.

We conclude, therefore, that the parties, having failed to sustain their respective burdens of proof, should be left in status quo: Dobroth is not entitled to any additional compensation and Bressi is not entitled to receive any repayment. However, since Dobroth's claim for $3,863.75 in expenses is undisputed, he is clearly entitled to recovery of that amount. Accordingly, we enter the following

## ORDER

And now, May 21, 1975, the award of arbitrators is hereby modified to read as follows: in favor of Richard E. Dobroth in the amount of $3,863.75.